UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| GARY JOHNSON and<br>CATHRYN MADZIWA,<br><br>        Plaintiffs,<br><br>v.<br><br>USCIS Director Detroit District,<br><br>        Defendant. | Case No. 2:14-cv-12713<br>Honorable Laurie J. Michelson |

## OPINION AND ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [16] AND
## DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [15]

In 2011, Plaintiff Gary Johnson, a United States citizen, petitioned the United States Citizenship and Immigration Services ("USCIS") to deem his non-citizen spouse, Cathryn Madziwa, his "immediate relative" so she could become a lawful permanent resident of the United States. In denying Johnson's petition, USCIS found that Johnson had not shown that his marriage to Madziwa was bona fide. Johnson and Madziwa now ask this Court to reverse the USCIS's denial. But in passing the Administrative Procedure Act, Congress recognized that federal agencies (such as the USCIS) have certain expertise that federal courts lack (such as determining when a marriage is bona fide). The Act thus prohibits this Court from reversing the USCIS's decision simply because it disagrees with it. Rather, Johnson must show that the USCIS's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A). As explained below, Johnson has not made this showing. The USCIS's decision must therefore stand.

**I.**

**A.**

Plaintiff Gary Johnson is a United States citizen. He was born in Detroit, Michigan and, apparently, has lived in Michigan for all of his life. (R. 2, 4, 137.) At the start of 2011—the year he met his wife—Johnson was attending school at Wayne County Community College. (*See* R. 11, 195.) Prior to the summer of 2011, Johnson quit school due to financial reasons. (R. 21–22, 196.) Around that time, Johnson, then 24 years old, began a business doing graphic design work on t-shirts. (R. 21–22, 196.) He was then living at his grandmother's home where his mother also lived. (R. 190.)

Plaintiff Cathryn Madziwa was born in Zimbabwe and is not a United States citizen. (*See* R. 2, 135.) She first came to the United States in 1997 to attend college in South Carolina beginning in January 1998. (R. 135–36.) After earning her undergraduate degree in business, Madziwa moved to Michigan and earned a master's degree in business from Central Michigan University. (*See* R. 136.) In late 2005 or early 2006, Madziwa married her first husband. (R. 317.) The relationship ended in divorce in March 2006. (AR 137.) Madziwa then moved to Wixom, Michigan and began working for Monumental Life Insurance. (R. 138.) Monumental provided her with a work visa. (*See* R. 138.) Madziwa moved to Ohio in 2007 and continued to work for Monumental. (*See* R. 138, 155, 225.)

In April 2011, Madziwa, then 40 years old, moved to an apartment complex in Wixom, Michigan. (*See* R. 27, 42, 141–42, 155.) This was the same complex where Johnson's sister, Renisha Johnson, lived. (R. 141–42.) In May 2011, Renisha and Madziwa ran into each other in one of the complex's laundry rooms. (R. 141.) Apparently they began talking and Renisha asked Madziwa to come over for dinner. (R. 141–42.)

Johnson and Madziwa first met at the dinner. (*See* R. 141–42.) Johnson would later recall, "my sister introduced [us] and we started to speak and I'm like, 'Where are you from?' You know, 'cause she had a heavy accent, you know. And she goes, she's from Zimbabwe. I was like, 'Wow, really?' . . . And I was like, 'Wow. You're over here and all your family is over there?' You know, so right there, that was like, 'Wow. You're a very strong person.'" (R. 198.) Madziwa similarly recalled, "he learned I was from Africa he just wanted to learn more and, of course, the first thing he noticed [was that] I had an accent. So he wanted to know more about me so we just kind of—he just asked more questions, you know, wanting to know about Africa. And that [is] pretty much what happened." (R. 146.)

Madziwa next saw Johnson in May or June 2011 when he showed up, uninvited, at her birthday party. (R. 48, 146–50, 198.) The party was a small gathering at Madziwa's apartment. (R. 146–50.) Johnson and Madziwa ended up talking and exchanging telephone numbers. (*See id.*)

A short time later, Johnson and Madziwa went to Ruby Tuesday (a restaurant). (R. 150, 198–99, 217.) Over the next couple months, the two continued to get to know each other. (*See* R. 152.) Madziwa would later recall, "we kept on going, you know, going to eat . . . . We would hang out, you know, watch movies together or just watch whatever is on television." (R. 152.)

Sometime in mid-August 2011, Johnson and Madziwa took a trip to Cedar Point, an amusement park in Ohio. (R. 152–53, 201–02.) While in line for one of the roller coasters, Johnson proposed to Madziwa and Madziwa accepted. (*See id.*)

The engagement was not lengthy: the two wed on October 28, 2011 at a state courthouse in Mount Pleasant, Michigan. (R. 11, 156, 188, 206.) Although they lived not far away, none of Johnson's mother, grandmother, or brother attended the wedding. (*See* R. 161, 207.) And the

couple's two witnesses, their friends, were unable to attend due to car trouble. (R. 159–60.) Following the wedding, there was a small reception at Renisha's apartment. (R. 158–61.) Johnson's brother attended along with a friend of Johnson's (one of the two would-be witnesses). (R. 161.) Johnson's mother did not attend; Madziwa recalled that she "was not kind of on board yet at the time." (R. 161.) According to Johnson, his mother had concerns about the couple's 17-year age difference. (R. 204–05.) Madziwa's immediate family, most of which live in Zimbabwe, did not attend the wedding or reception. (*See* R. 161, 174, 213.)

After the wedding, Johnson began living with Madziwa at her apartment. (R. 162, 209.) On work days, Madziwa would drop Johnson off at a disabled friend's house so that Johnson could help his friend with the housekeeping. (R. 170–72.) Johnson was paid around $500 per month for his services. (R. 170.) With exception for December 2011, when her work authorization expired, Madziwa continued to work for Monumental. (R. 138, 169.) Madziwa earned about $4,000 per month. (R. 170.)

### B.

About two weeks after their wedding, Johnson filed a Petition for Alien Relative, Form I-130, asking the United States Citizenship and Immigration Services to deem Madziwa his "immediate relative" and to thus conditionally classify her as a lawful permanent resident. *See* (R. 2–7); 8 U.S.C. §§ 1154(b), 1186a.[1] In support of his petition, Johnson included his birth

---

[1] "The determination that an alien spouse qualifies as an immediate relative under [8 U.S.C. § 1154] is only the first step in a longer process that was enacted specifically to address concerns about marriage fraud. Once an alien has been classified as an immediate relative pursuant to the procedure described above, [s]he is only entitled to a two year conditional status as a lawful permanent resident. In order to remove the conditional basis of [her] residency, an alien spouse is required to [again] petition the government near the end of this two-year period. . . . The petition must . . . be accompanied by documentation establishing that the marriage was not entered into in order to evade the immigration laws of the United States." *Bilali v. Gonzales*, 502 F.3d 470, 471 (6th Cir. 2007) (internal quotation marks and citations omitted).

certificate; the couple's marriage certificate; a copy of Madziwa's judgment of divorce from her first husband; a copy of his and Madziwa's driver's licenses with the same address; a copy of his and Madziwa's debit cards linked to the same account; a copy of Madziwa's employee benefits elections listing Johnson as her beneficiary for vision, dental, medical, and life insurance; an electric bill addressed to both him and Madziwa; holiday cards that he and Madziwa had exchanged; and photos of himself with Madziwa. (*See* R. 76, 86–130.)

On March 13, 2012, Johnson and Madziwa (with their current counsel) appeared for an interview with USCIS Officer Jovana Gjelaj. (*See* R. 12, 132.) Officer Gjelaj conducted the interview in two parts: she first questioned Madziwa outside of Johnson's presence, and then asked similar questions of Johnson outside of Madziwa's presence. (*See* R. 132–230.) The interview covered a wide range of topics, including Johnson's and Madziwa's personal histories, how the couple met, how Johnson proposed, where each lived before and after the marriage, the names of their spouse's immediate family members, the method of birth control that the couple used, the couple's income, who paid the bills and how, what the couple's schedule was on workdays, and when and where they last went on a date. (*See* R. 132–230.)

On March 23, 2012, the Field Operations Director for the Detroit branch of the United States Citizenship and Immigration Services, Michael Klinger, sent Johnson and Madziwa a Notice of Intent to Deny. The Notice provided that Johnson had the "burden of proof" of demonstrating that the couple's marriage was not "for the purpose of circumventing the immigration laws" and that the central question was whether the two "intended to establish a life together at the time they were married." (R. 15.) The Notice went on to detail why the USCIS thought that Johnson had not carried his burden. (*See* R. 15–19.)

Regarding the documentary evidence that Johnson had submitted, the Notice stated, "USCIS would look more favorably upon the documents which were generated throughout the duration of a relationship due to the bona fide activities of a shared life, than such monthly bank statements, credit card, utility bills, character references, etc. that appear to have been established for the instant purpose of being submitted as evidence." (R. 16.) Specifically referencing the photos that Johnson and Madziwa submitted, the USCIS stated, "The pictures that were submitted in support of your petition appear to be staged photos. . . . Your spouse was shown specific photos [and she] claimed the pictures to be taken at a wedding celebration. Neither you nor your wife had your rings on during these photos." (R. 4.)

Regarding the couple's interviews, the USCIS identified 20 inconsistencies in the couple's answers. The following are a few:

> Your spouse stated that her full name is Cathryn Madziwa.
> When you were asked what her name is you said Cathy and were unable to pronounce her last name. When asked to spell her name you spelled her name Mdizwa. You were unable to pronounce or spell your spouse's name. You were hesitant in answering what her last name is. You also failed to know what your spouse's real name is, it is Cynthia not Cathy.
>
> You[r] spouse stated that she first came to the United States in 1998.
> You stated that your spouse first entered the United States in 2000. . . .
>
> Your spouse stated that her previous marriage ended in divorce after only 2 months of marriage. She further stated that her divorce was final in March of 2006.
> You stated that your spouse divorced her previous spouse in August of 2011. . . .
>
> Your spouse stated that throughout the summer you attended class five days per week and that you attended afternoon and evening classes.
> You stated that you did not attend school that summer. . . .
>
> Your spouse stated that you asked her to marry you while you were at a trip in Cedar Point Ohio in August. She stated that you asked her to marry you while in line for a ride. She further stated that you did not give her a ring that day.
> You stated that you asked your spouse to marry you and that you did give her a ring while in Cedar Point. You further stated that it was August 15th and it was a

Saturday because you both drove home on Sunday after your trip. The 2011 calendar shows that August 15 2011 was a Monday. . . .

[Your spouse] stated that she lived in Ohio and moved to Michigan April of 2011. . . .
You [stated] that your spouse moved to Michigan from Ohio in 2005 or 2006. . . .

(R. 16–17.)

The Notice concluded by informing Johnson that the USCIS intended to deny his petition, but that he had 30 days to submit evidence "to rebut the information presented" and that "[a]bsent any countervailing evidence, a decision [would] be rendered based upon the merits of the record." (R. 19.)

## C.

For the next year and a half, no further progress was made on Johnson's immediate-relative petition. Counsel for Johnson and Madziwa sent a response to the Notice on May 17, 2012, but the USCIS did not receive it. (*See* R. 12–13.) The administrative record does not indicate why this happened, but perhaps it was related to the fact that May 17, 2012 was after the 30-day response period set out in the Notice. In any event, on November 13, 2013, Officer Gjelaj contacted counsel for Johnson and Madziwa, and, that day, counsel resent the couple's response to the Notice of Intent to Deny. (R. 12.)

Included in the response was an affidavit from Johnson addressing the inconsistencies identified by the USCIS in the Notice. Regarding Johnson's difficulties in pronouncing and spelling his wife's name, Johnson clarified, "My wife's full name is Cathryn Madziwa, not 'Cynthia' as the NOID asserts." (R. 21.) He further explained, "I always call her Cathy though, and her last name is foreign and difficult to pronounce and spell. The officer was also very intimidating in tone and demeanor at the interview and I fumbled a bit at the beginning." (R. 21.)

7

Regarding the date on which Madziwa came to the United States, Johnson averred, "Cathy first came to the United States as a student in December of 1997, not in 1998 as the [Notice] asserts. However, her last re-entry into the U.S. was in January of 2001. When the officer asked when Cathy came to the United States, I thought she meant the most recent time that Cathy entered the United States, not the first time she entered the country. I was thinking of her most recent entry into the United States when I said 2000." (R. 21.)

As for Johnson's incorrect response about when Madziwa divorced her first husband, Johnson stated that he and Madziwa did not talk about her prior marriage often: "We are together and we don't find it necessary to discuss our previous relationships on a regular basis. I could not remember the specific details of when Cathy divorced her ex-husband at the interview." (R. 21.)

As for the couple's differing answers regarding Johnson's school attendance in the summer of 2011, Johnson explained, "I attended Wayne County Community College but was kicked out because I could no longer afford tuition. I was too ashamed to tell Cathy about this when we met, and I continued to go to the library several days a week to study." (R. 21.)

Regarding whether Johnson gave Madziwa a ring at Cedar Point and whether he proposed on August 15, 2011, Johnson clarified that the two went to Cedar Point "in the week leading up to" August 15, 2011 and that, when he proposed, he provided Madziwa with a "token ring" and told her that he would "get her a real one when [the two] returned to Michigan." (R. 21.)

As for when Madziwa moved to Michigan from Ohio, Johnson explained, "when I said that Cathy moved from Ohio to Michigan in 2005 or 2006, instead of Ohio I meant Mt. Pleasant[, Michigan]. She moved from Mt. Pleasant in 2006 to Wixom, Michigan and then left

Michigan for Ohio in 2007. She moved back to Michigan in April of 2011, shortly before we met." (R. 21.)

In addition to Johnson's affidavit, the response to the Notice of Intent to Deny included a brief prepared by Johnson and Madziwa's counsel, additional photos, supplemental letters from Johnson's mother and sister, letters from four of the couple's friends or neighbors, and a 2011 tax return with a status of "[m]arried filing jointly." (R. 24–74.) As an example of the letters, Johnson's mother wrote:

> My name is Dorsheia Johnson, I am a U.S. citizen from birth. My son Gary Johnson Jr. and his wife Cathryn Madziwa asked that I write this letter of support regarding his marriage to Cathryn and their activities of daily living (ADL) that I have personally have witness. Activities we have shared as a family. We have enjoyed dinners together as well as picnic, plays, bowling, church which is my favorite, family get[-]togethers, dinners on special occasion, late night talks, problem solving when they or as they arise. I really enjoy their company. There is no doubt that they love and respect each other. They affection for each other is clear for any observer to see that it is tru[]ly real! (Especial[ly] me).

(R. 50–51.) As another example, a neighbor of Johnson and Madziwa wrote, "I knew that [Gary and Cathryn] got married last year 2011 and I see them often doing laundry [and] taking walks around our complex. They are always very pleas[a]nt. Gary loves to play with my dog [D]iva. Devin Barbee." (R. 57.)

### D.

By July 2014, Johnson still had not received a decision on his petition. So, that month, Johnson and Madziwa filed this lawsuit against the Detroit District Director of the United States Citizenship and Immigration Services. (Dkt. 1, Compl.) Johnson and Madziwa's complaint alleged that they had made "numerous status inquiries" and that the USCIS failed to provide a decision even after informing them that one would be forthcoming in 30 to 45 days. (Compl. ¶ 15.) The complaint thus asked this Court to, by way of a writ of mandamus, "compel the

Defendants to complete processing of Plaintiffs' applications for adjustment of status without delay." (Compl. ¶ 22.) Johnson and Madziwa also sought $500,000 in compensation for the USCIS's delay. (Compl. ¶ 23.)

**E.**

About two weeks after they filed their complaint, the USCIS rendered a "Decision" and denied Johnson's Petition for Alien Relative. (R. 246–53.)

Regarding the additional photos that Johnson submitted in his response to the Notice of Intent to Deny, the USCIS stated that it was "unable to see the faces or background of at least three of the five photographs. As for the other two photographs, one appears to have been taken indoors and the other outdoors; however, the quality of these photos is very poor. As mentioned above, the submission of the original photographs was already in question. These new photocopies do not address the doubts associated with the original submission and raise doubts as to their authenticity." (R. 251.)

The Decision also gave limited weight to the supplemental letters submitted by Johnson's mother and sister and Johnson and Madziwa's friends and neighbors. In particular, the USCIS stated,

> It is noted that most of the affidavits submitted do not address the discrepancies listed in the [Notice of Intent to Deny] and some lack personal know[le]dge. . . . For example, the affidavit from D[e]vin Barbe[e] is not notarized; whereas, the one from Tonya Hampton lacks the required personal know[le]dge. The rest of the affidavits are from your mother, sister and beneficiary[']s friend, Gloria Reid. These affidavits talk about the fact that you and the beneficiary and the affiants have enjoyed some activities together such as movies, shopping, etc. Overall these affidavits contain limited substantive information and could also be viewed as self-serving[.]

(R. 251–52.) As such, the USCIS afforded "little weight to this evidence." (R. 252.)

10

2:14-cv-12713-LJM-MJH   Doc # 26   Filed 01/11/16   Pg 11 of 23   Pg ID 563

The Decision also addressed the affidavit that Johnson submitted in response to the Notice. As for Johnson's explanation for not knowing when Madziwa divorced, the USCIS reiterated its prior position: "you state that you do not talk about [the] beneficiary's previous marriage as this being the reason for providing the wrong date of divorce. Your wife was divorced years before you met and married, yet, you stated at the interview that she had only divorced her ex-husband a year ago." (R. 251.) Regarding Johnson's explanation for not correctly stating when Madziwa came to the United States, the Decision provided: "You also state in the affidavit that you misunderstood the question related to your wife's first entry into the U.S. However, you did not show any sign of confusion and the question posed was clear in so far as it asked when was the first time your wife entered the U.S., not the last time." (R. 251.) In addressing Johnson's explanation for not knowing when Madziwa moved to Ohio, the USCIS informed: "In your letter you state that Cathy lived in Mt. Pleasant and then Wixom. Contrary to this claim, Cathy's Form G-325A lists her as living in Frankenmuth[, Michigan] before moving to Ohio." (R. 251.) Regarding whether Johnson proposed with a ring or not, the decision stated: "You also state in the letter that you did give Cathy a token ring and this supports your statement given at the interview. However, no explanation is provided as to why Cathy stated that you proposed without having a ring." (R. 251.)

The Decision ultimately informed Johnson that "[t]he preponderance of the evidence in the record [did] not support the conclusion that [he] and [Madziwa] entered into a bona fide marriage." (R. 252.) The USCIS explained,

> Although[] you have produced some evidence to provide the appearance of a spousal relationship, this evidence when question[ed] and analyzed further appears to be a mere façade to portray the appearance of a bona fide marriage. For example, you did not submit any proof of commingling of any funds, even though you claimed to have joint bank accounts and file joint income tax returns.

11

Additionally, you did not submit any evidence of a shared life together and[/]or cohabitation, i.e. lease agreements, bills, etc.

(R. 252.) The USCIS thus denied Johnson's Form I-130 for failing to meet his burden of proof. (*Id.*)

## F.

A few days after the USCIS denied Johnson's petition, Johnson and Madziwa amended their federal-court complaint. (*See* Dkt. 4, Am. Compl.) They now ask this Court to declare that the USCIS's denial of Johnson's petition was unlawful. (*See* Am. Compl. ¶¶ 1, 25, 30.)

In March 2015, both Plaintiffs and Defendant filed motions for summary judgment. (Dkts. 15, 16.) Johnson and Madziwa claim that the USCIS's denial of Johnson's petition was "arbitrary" or "not in accordance with law" as those phrases are used in the Administrative Procedure Act. (*See* Dkt. 15, Pls.' Mot. Summ. J. at Pg ID 366.) The District Director disagrees and asks the Court to let the USCIS's decision stand. (*See generally* Dkt. 16, Def.'s Mot. Summ. J.)

## II.

Two legal standards govern the disposition of this case: the standard that the USCIS uses to decide whether to deem an alien spouse an "immediate relative" and the standard that this Court applies in reviewing the USCIS's decision.

## A.

"In order for an alien to obtain permanent residency on the basis of marriage to a United States citizen, the citizen spouse must first file a petition to classify the alien spouse as an 'immediate relative.'" *Bilali v. Gonzales*, 502 F.3d 470, 471–72 (6th Cir. 2007) (quoting 8 U.S.C. § 1154(a)(1)(A)(i); 8 C.F.R. § 204.2(a)(1)). Following an investigation, the USCIS (exercising the authority of the Attorney General) "shall" approve the petition if it "determines

that the facts stated in the petition are true" and that the alien spouse is an "immediate relative." *See* 8 U.S.C. § 1154(b). But the USCIS must deny the petition if it "determine[s] that the alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws." 8 U.S.C. § 1154(c).

In complying with these statutory mandates, the key question for the USCIS is whether the bride and groom "intend[ed] to establish a life together at the time they were married." *Bark v. INS*, 511 F.2d 1200 (9th Cir. 1975); *see also Acheampong v. Keisler*, 250 F. App'x 158, 161 (6th Cir. 2007) ("The seminal case [on whether a marriage was entered into in good faith] explained that courts must consider the evidence and ask whether the parties 'intend[ed] to establish a life together at the time they were married.'" (quoting *Bark*, 511 F.2d at 1201)). Whether a couple intended to establish a life together "involves deeply personal questions, including those that probe the couple's courtship, their shared experiences, their living arrangements after marriage, and the degree to which they share assets and liabilities." *Surganova v. Holder*, 612 F.3d 901, 904 (7th Cir. 2010); *see also Acheampong*, 250 F. App'x at 161 (providing that relevant evidence of an intent to establish a shared life includes "'proof that the petitioner's spouse has been listed on insurance policies, property leases, income tax forms, or bank accounts, and testimony or other evidence regarding courtship, wedding ceremony, shared residence, and experiences.'" (quoting *Matter of Soriano,* 19 I. & N. Dec. 764, 766 (BIA 1988))).

## B.

Under the Administrative Procedure Act, this Court "shall" set aside the USCIS's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A). Although at times Johnson and Madziwa appear to invoke all

these alternatives (*see* Am. Compl. ¶ 2), their argument is centered on claims that the USCIS's decision was (1) arbitrary and capricious or (2) not in accordance with law (Dkt. 21, Pls.' Resp. at 7–8.)

"[I]n making the factual inquiry concerning whether an agency decision was 'arbitrary or capricious,' the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989); *see also Kentucky Coal Ass'n, Inc. v. Tennessee Valley Auth.*, 804 F.3d 799, 801 (6th Cir. 2015) ("We ask not whether the agency's decision was right but whether as a matter of process we can 'reasonably discern' why the agency did what it did and whether as a matter of substance that decision was not arbitrary."). Arbitrary and capricious review "is not an invitation for judicial second-guessing." *Kentucky Coal*, 804 F.3d at 801. Thus, if the USCIS "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action,'" this Court will not set aside its decision. *Kentucky Coal*, 804 F.3d at 801 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).[2]

"Agency action is 'not in accordance with the law' when it is in conflict with the language of the statute relied upon by the agency." *City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007).

---

[2] "The Supreme Court has noted that the arbitrary or capricious provision in § 706(2)(A) and the substantial evidence standard in § 706(2)(E) are separate standards, and that it would be consistent to find one violated while the other is not." *Kroger Co. v. Reg'l Airport Auth. of Louisville & Jefferson Cty.*, 286 F.3d 382, 387 (6th Cir. 2002).

### III.

### A.

Combining the foregoing standards, the primary question for the Court is this: Based on the evidence that Johnson submitted in support of his petition and Johnson's and Madziwa's interviews, did the United States Citizenship and Immigration Services provide reasonable grounds for concluding that the couple did not intend to establish a life together when they married?

Some of the evidence in the administrative record suggests that the answer is "no" and that Johnson and Madziwa have, as they assert, a bona fide marriage. Both Johnson and Madziwa testified consistently about how they first met (that Madziwa met Johnson's sister in their apartment laundry room, that Johnson's sister arranged a dinner, and that, at the dinner, Johnson expressed interest in Madziwa's heritage). (*Compare* R. 141–42, 146, *with* R. 193, 197–98.) Both Johnson and Madziwa testified consistently about Johnson "crash[ing]" Madziwa's birthday party. (*Compare* R. 146, *with* R. 198.) And they both said that their first date was at Ruby Tuesday. (*Compare* R. 150, *with* R. 198.) The couple consistently recalled that Johnson proposed at Cedar Point while the two were in line for the Millennium Force ride. (*Compare* R. 152–53, *with* R. 201.) Johnson and Madziwa both named the same birth control (Junel) when the immigration officer asked which they used. (*Compare* R. 181, *with* R. 219.) Further, Madziwa knew about Johnson's poor relationship with his father. (*Compare* R. 140, *with* R. 190–91.) She also could give the names of Johnson's grandmother, mother, sister, and brother. (*Compare* R. 140, *with* R. 190–91.) And Johnson knew that Madziwa had three brothers and three sisters and that one of them lived in London. (*Compare* R. 174, *with* R. 215.) (Although he did say that one of Madziwa's brothers lived in London when in fact it was one of her sisters.) In addition, there

15

is some documentary evidence of an intent to establish a life together, such as the holiday cards the two exchanged, Madziwa's benefits elections (R. 88–90), a jointly-filed federal tax return (R. 61–74), and letters from friends and family members (R. 55–59, 83–85).

Further, some of the inconsistencies that the USCIS identified are either incorrect or insignificant. For example, in the Notice of Intent to Deny, the USCIS stated that Madziwa's first name was Cynthia, but, as Johnson pointed out, this is incorrect. (*See* R. 21.) The USCIS also incorrectly asserted that Madziwa and Johnson testified inconsistently about the scope of Johnson's graphic design work: "[Your wife] stated that you do graphic designs on everything. You stated . . . that you only design T-shirts." (R. 17.) Contrary to this assertion, Madziwa testified that Johnson "want[ed]" to do designs on items other than t-shirts and that he was "looking at" that possibility:

> [OFFICER GJELAJ:] Okay. So he's doing clothing design.
>
> [MADZIWA:] Yeah. He calls it art, different(?) design.
>
> [Q.] Okay. So is it going to go on a painting that you hang on the wall? Is it just through clothing? Is it something that—
>
> [A.] Yeah. Through—most of his—
>
> [Q.] —on postcards?
>
> [A.] Most of it through—yeah. He *want[s]* to do more actually. He['s] *looking at* be putting his designs on different things, not just on clothes, but on other different things, too.

(R. 145 (emphases added).) And, unlike the USCIS, this Court would not have found the couple's testimony about the number of people who attended Madziwa's birthday party to be significant.

Still, the question for this Court is not whether Johnson and Madziwa have a bona fide marriage. Rather, the question is whether the USCIS arbitrarily concluded that Johnson failed to show (more likely than not) that his marriage to Madziwa is bona fide. *See San Luis & Delta-*

*Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) ("It is not the reviewing court's task to make its own judgment about the appropriate outcome. Congress has delegated that responsibility to the agency." (internal quotation marks and citation omitted)). The Court finds that the USCIS articulated rational grounds for its decision.

First, the USCIS correctly explained that Johnson had difficulty spelling—and even saying—Madziwa's last name:

> [OFFICER GJEJAL:] Who are you married to?
>
> [JOHNSON:] Cathy.
>
> [Q.] Cathy?
>
> [A.] [Inaudible]. I always mess her name up all the time. Mezba—[Inaudible].
>
> [Q.] Spell it if you can't say it. You don't know your wife's name?
>
> [A.] I can say it. I mean, I always, I always slaughter it. I always slaughter it.
>
> [Q.] Okay. How about you try to slaughter it for me?
>
> [J.] Okay. Medazuwa(?).
>
> [Q.] How about you spell it for me.
>
> [A.] Oh, it's M-D-I-Z-E-W-A.
>
> [Q.] E-W-N?
>
> [A.] No. I said A.
>
> [Q.] A-W.
>
> [A.] I said M-I—
>
> [Q.] You said M-D-I-Z—
>
> [A.] W-A.

(R. 186–87.) Even taking into account Johnson's explanation that Madziwa's "last name is foreign and difficult to pronounce and spell" and that he was nervous at the outset of the interview (R. 21), it was not unreasonable for the USCIS to question Johnson's familiarity with Madziwa based on his inability to correctly spell and pronounce his wife's last name.

Second, the dates Johnson provided for Madziwa's divorce and her move to Ohio were not close. After a very short marriage, Madziwa divorced in March 2006, moved to Ohio in 2007

17

2:14-cv-12713-LJM-MJH   Doc # 26   Filed 01/11/16   Pg 18 of 23   Pg ID 570

or 2008, and continued to live in Ohio until she moved back to Michigan in April 2011. (R. 137,

154–55.) But Johnson testified:

> [OFFICER GLEJAL:] And how long ago was [her divorce]?
>
> [JOHNSON:] How long ago was that?
>
> [Q.] Mm-hmm.
>
> [A.] Um, let me see. That was before we got together so I'm guessing August.
>
> [Q.] August of?
>
> [A.] 2011.
>
> [Q.] Of 2011?
>
> [A.] Yeah.
>
> [Q.] She got divorced?
>
> [A.] Yeah.
>
> * * *
>
> [Q.] Okay. And so then, um, when was [Cathy] in Ohio? For a job, when?
>
> [A.] Yeah. She was—let me see. This was probably—it was way before we met. It was—I want to say probably 2002.
>
> [Q.] In 2002—
>
> [A.] Oh, she—actually, no, it was like 2005 or 2006. That's when she came back from it(?). Yeah.
>
> [Q.] So she has been living in Michigan then since '05 of '06?
>
> [A.] Yeah, yep.

 (R. 189–90, 203–04.) Because the August 2011 divorce date that Johnson referenced was after

he had started dating Madziwa, the USCIS could reasonably discount Johnson's explanation that

he and Madziwa did not discuss her past relationships. As for when Madziwa lived in Ohio, it is

true that Johnson explained, "when I said that Cathy moved from Ohio to Michigan in 2005 or

2006, instead of Ohio I meant Mt. Pleasant[, Michigan]." But the problem with this explanation

is that it is incomplete: why would Johnson confuse Ohio with Mr. Pleasant? Moreover, given

that Madziwa and Johnson started dating in May 2011, it seems likely that Madziwa would have

at some point mentioned that she had only returned to Michigan a month earlier. The Court thus

finds nothing unreasonable about the USCIS questioning Johnson's familiarity with Madziwa based on his inability to state—even generally—when she divorced and when she lived in Ohio.

Third, the USCIS reasonably questioned the legitimate nature of Johnson and Madziwa's marriage based on the couple's inconsistent testimony about Johnson's proposal. In particular, Madziwa recalled:

> [OFFICER GJELAJ:] So how did he ask you now?
>
> [MADZIWA:] He just, uh—we just [inaudible] roller coaster, and he just knelt down and just say, "Will you marry me?"
>
> [Q.] On the roller coaster?
>
> [A.] We just about to jump on the roller coaster, yes.
>
> [Q.] Which one?
>
> [A.] The Millennium.
>
> [Q.] Did he give you a ring there?
>
> [A.] Uh, *he didn't have a ring right then*, just says, "Will you marry me?" And, uh, *got the ring later*.

(R. 152–43 (emphases added).) In contrast, Johnson recalled,

> [OFFICER GLEJAL:] Where did you ask her at?
>
> [JOHNSON:] Uh, inside the theme park.
>
> [Q.] Where?
>
> [A.] You mean where? By the—you know the ride Millennium Force?
>
> [Q.] Mm-hmm.
>
> [A.] It was like right—you know.
>
> [Q.] *Did you give her a ring?*
>
> [A.] *Uh, yeah.*
>
> [Q.] Did you get down on one knee?
>
> [A.] Yeah. I mean, I had to make the whole thing—make a scene actually. . . .
>
> [Q.] So you got down on one knee.
>
> [A.] Yeah.
>
> [Q.] *Took a ring out of your pocket.*
>
> [A.] *Yeah.* And just said it, you know.

[Q.] Where did you get a ring at?

[A.] Uh, it was Helz(?) something?

[Q.] How much did you pay?

[A.] Uh, it wasn't that much. It was like, uh, probably like, uh, I'm kind of embarrassed to say.

[Q.] How much was it, sir?

[A.] All right. Well, like probably $200 at least, something like that.

(R. 201–02 (emphases added).) The USCIS could reasonably presume that the significance of this event is something a committed couple would recall with more consistency. Thus, even in light of Johnson's explanation that the ring was merely a "token," it was reasonable for the USCIS to have questioned the bona fide nature of Johnson and Madziwa's marriage based on their inconsistent testimony about Johnson's proposal.

The USCIS also concluded that the pictures taken at the wedding celebration at Johnson's sister's house showed Johnson and Madziwa without wedding rings or with rings on their right, as opposed to the traditional, left hands. (Petition Decision at 4; Notice at 4; *see also* R. 183–85, 223–24.) In particular, in the Notice of Intent to Deny, the USCIS asserted,

> The pictures that were submitted in support of your petition appear to be staged photos. You and your spouse were asked specifically about the times and date that the pictures were taken. Your spouse was shown specific photos [and] claimed the pictures to be taken at a wedding celebration. Neither you nor your wife had your rings on during these photos. You were questioned about this discrepancy [during the interview] and offered no explanations. You stated that you never take [off] your wedding ring. You were asked more than once if you ever remove your ring. You were showed the pictures that you submitted in support of your petition again and claimed that the pictures were taken after your marriage. Again, neither of you have your rings on.

(R. 18.) In responding to the Notice, Johnson did not contest these findings. (*See generally* R. 21–42.) As such, the Court finds this to be another reasonable basis for which the USCIS could doubt the legitimacy of Johnson and Madziwa's marriage.

20

Fifth, although the Court does not agree with the USCIS that "[Johnson] did not submit any proof of commingling of any funds" (AR 252), the USCIS nonetheless reasonably questioned whether Johnson and Madziwa pooled their income and expenses. In the Notice of Intent to Deny, the USCIS informed Johnson that the debit cards he submitted "did not have any bank statements attached" and that the cards alone "fail[ed] to show if there [had been] any activity in any of [the] accounts that [were] held jointly[.]" (AR 19.) In responding to the Notice, Johnson did not submit any bank statements associated with the debit cards. (*See generally* AR 43–74.) The USCIS could reasonably infer from Johnson's failure to submit the statements that Johnson and Madziwa were not actively using their joint account.

In sum, the administrative record may permit a finding that Johnson demonstrated, more likely than not, that his marriage is bona fide. But the USCIS reasonably thought otherwise based on the contrary evidence. Thus, the Court finds that the USCIS did not arbitrarily or capriciously conclude that Johnson failed to show by a preponderance of the evidence that he had Madziwa intended to establish a life together at the time that they married.

**B.**

This leaves Johnson and Madziwa's claim that the USCIS's denial of Johnson's petition was "not in accordance with law" as that phrase is used in Administrative Procedure Act. In this alternative argument, Plaintiffs assert that the administrative record so strongly shows that they have a bona fide marriage that the only way the USCIS could have denied Johnson's petition was if it held Johnson to the wrong standard of proof. In particular, Johnson and Madziwa argue, "while the [District Director] may have *stated* in its [Notice of Intent to Deny] and its [Decision] that the 'preponderance of evidence' standard was employed, the testimony and documentation

contained in the administrative record make it clear that either [the USCIS used] a higher standard[] or . . . misapplied the correct preponderance standard." (Dkt. 21, Pls.' Resp. at 10.)

The Court is not persuaded. A necessary premise of Johnson and Madziwa's argument is that upon placing all the evidence of record on a balanced scale, the scale tips strongly to the side of a bona fide marriage. But if this were the case, it would not be rational to read the scale in equipoise or tipping to the side of a sham marriage. Yet the Court has already explained that the USCIS reasonably thought that Johnson had not shown, more likely than not, that his marriage to Madziwa was bona fide. This finding, coupled with the explicit recitation of the correct legal standard by the USCIS in the Decision (R. 252), suffices to conclude that the USCIS did not apply the wrong legal standard in deciding Johnson's petition. As such, Johnson has not shown that the USCIS did not act "in accordance with law" under the Administrative Procedure Act.

### C.

One final point. Johnson stresses that he has now been married to Madziwa for over three years and asks the Court to consider documentation that was not part of the administrative record. But the parties stipulated, in accordance with the law, *see Kroger Co. v. Reg'l Airport Auth. of Louisville & Jefferson Cty*., 286 F.3d 382, 387 (6th Cir. 2002), that this Court's review of the USCIS's decision would be limited to the record that was before the USCIS (Dkt. 13, Admin. R. Stipulation at Pg ID 361; Pl.'s Mot. Summ. J. at 6; *see also* Dkt. 24, Def.'s Reply at 1–3). As such, the documentation from 2014 and 2015 that Johnson has submitted to this Court is not proper for consideration in determining whether the USCIS's decision was reasonable and in accordance with the law.

Notably, however, the District Director contends that Johnson may "submit[] a new application and any evidence [he] possesse[s]." (Dkt. 18, Def.'s Resp. at 5.) Should Johnson

elect this route, the Court trusts that the USCIS will consider the documentation that Johnson has asked this Court to consider.

## IV.

For the stated reasons, the Court finds that the United States Citizenship and Immigration Services did not arbitrarily or capriciously deny Johnson's petition to classify his wife as an "immediate relative" for purposes of establishing her as a lawful permanent resident. Nor did the USCIS fail to act in accordance with the law in denying Johnson's petition. As such, the Court DENIES Plaintiffs' Motion for Summary Judgment (Dkt. 15) and GRANTS Defendant's Motion for Summary Judgment (Dkt. 16). As this opinion and order ends the case, a separate judgment will follow.

SO ORDERED.


In accordance with the Court's Opinion and Order dated January 7, 2016, the Court hereby enters judgment in favor of Defendant, granting Defendant's Motion for Summary Judgment.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated: January 11, 2016


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on January 11, 2016.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson